We'll now move to the next case on the calendar. That's VCFP versus Law Offices of Crystal Moroney. Mr. Samp, are you there? Yes, this is Richard. Okay, great. Good morning, Your Honor. Mr. Freidel. Is it Freidel or Freedale? Freedale, Your Honor. Good morning. Okay, so Mr. Samp, you reserve two minutes for rebuttal. So that gives you eight minutes out of the gate. The pleas to court. My name is Richard Samp. I am here representing the Appellate Law Offices of Crystal Moroney. This appeal raises two significant issues regarding the Constitution's requirement for the separation of powers. However, I think it's very important to emphasize the human elements of this case as well. If the CFPB's goal was to hound Ms. Moroney out of business, they have succeeded. As a result of the twin problems that she faced, first involving the COVID crisis, and secondly, the huge costs of complying with four different CIDs issued by CFPB, she closed her offices last fall. The interesting fact here, however, is that CFPB has never accused her of any violations of the debt collection laws. Instead, it simply says they are taking an investigation to see if perhaps there were violations. To me, that just simply underscores the difficulty you have when you have an agency that has absolutely no accountability to Congress. That's why we think it is particularly important that the court take a very careful look at the way this agency is funded. As far as we know, this is a unique situation. The CFPB gets its funding by virtue of a provision passed by Congress 11 years ago that says that the CFPB is entitled, through its director, to demand as much money as it wants each year for any purpose, so long as the amount sought does not exceed 12% of the Federal Reserve's ever-increasing budget. Congress knew well then, and it is still true, that the amount that is nowhere near 12% of the Federal Reserve's budget. The result is that it is up to the director and his supervisor, the president, to have 100% control over how much money the agency is to demand. This is not unique, as I understand it, at least from reading the papers here, that the Federal Reserve Board, the FDIC, the National Credit Union Administration, the Officer Controller, are all funded other than through regular appropriations. And they're funded out of the proceeds. I guess in the OCC's case, they're fees that are paid, but they're paid out of the Fed. Is that correct? No, it's not. Every single one of those agencies you refer to are self-funded agencies. They obtain income from a variety of sources, and they use that money. So that, for example, ever since the founding, we have had a post office, and nobody has ever suggested that the postmaster is not permitted to use the money that it generates from its services to pay for those services. And the same is true for every one of the agencies you mentioned. They have huge sources of income of their own, and that's what they are spending. Here, on the other hand, we have an agency that is getting money, that is government money that has been appropriated years ago by Congress, without any direction as to how that money is to be spent. Under Article 1, Section 1 of the Constitution, the legislative power is vested solely in Congress, and it may not divest that power. Under Article 1, Section 9, which is the Appropriations Clause, it is required that money be appropriated by Congress. We're not saying that agencies are not permitted significant leeway into exactly how they spend their funds, but in this particular case, there is absolutely no control. It is totally up to the agency, how it wants to spend its money, and how much money it is to get. And I don't think there's any precedent. I guess my earlier point in raising these other agencies was, there's no congressional control there either, even though their funding may be self-generated. They are not receiving money from the government in the same way. Yes, the Postmaster... The control point you just made would be an argument that could be made with regard to these other particular agencies that I mentioned. That's true. And one of the things that the Supreme Court has emphasized in all of its separation of powers cases is historical precedent. Is there precedent for what is going on? And as I mentioned, the idea that self-funded agencies do not need to receive regular appropriations from Congress because the money really isn't coming from Congress, that is well accepted. If, however, you look for historical precedent for what is going on with the CFPB, there is none. The CFPB argues that they have the right to... They say, well, this is very similar to mandates that are issued, say, for Social Security and things of that sort. Well, the fact is that Congress has written very detailed laws governing how that money is to be spent, even if it is not done on an annual basis. Now, the other major constitutional issue here has to do with whether or not the agency properly ratified the actions that it took at a time when it admittedly was not constitutionally structured. It filed its enforcement action in April of 2020. Two months later, the Supreme Court held that the CFPB was not constitutionally structured. Three days after that decision came down, the CFPB purportedly ratified that decision, and our argument is that there was no proper ratification. How many days were required? Seven? No. First of all, ratification in this particular would have taken the form of issuing a new CID, which we have never argued that they don't have a right to do. Instead, they tried to ratify a court action at a time when they did not have the right to file the court action, which meant, of course, that the court had no Article 3 jurisdiction at the time that the action was filed. The result of that is that the action from the very beginning was void and was not subject to ratification, because it's very clear that a federal court does not have jurisdiction unless the plaintiff has standing at all times, which means including at the time the case was filed. This court very clearly in its NLRB versus Nurek Electric decision this past year said that there can be no ratification if the original decision to file the action in court was void. Secondly, even if it was merely voidable and instead of being void, which as I've tried to demonstrate, it really was void, the court said in the Nurek Electric case that there must be an independent and detached evaluation. Well, it's not just simply that they attempted to ratify this and a whole host of other decisions within three days after the Supreme Court ruled, which would suggest that it was not independent and detached, but I think one of the most striking features of the ratification was that there was a lengthy set of regulations which had previously been adopted by CFPB to govern how CIDs were to be issued. Well, those regulations were not ratified by CFPB until some weeks later. In other words, they purported to ratify the issuance of this CID long before they had regulations in place that would determine how they were to conduct this independent and detached evaluation. They had no regulations that would allow this ratification. Now, we want to emphasize here that Didn't you just say a minute ago, and isn't it true, that those regs were promulgated earlier, but then were invalidated by the Supreme Court's decision? That's right. So the normal way to proceed if you were doing an independent and detached evaluation is the first thing you'd do is you would look at your regulations for issuing CIDs and you would say, okay, we think those regulations are good or perhaps they should be slightly tweaked. And then once you had those regulations adopted, then you would do your independent and detached evaluation of individual CIDs to decide whether or not those are properly issued. That's I guess they used the original defunct regulations as guidance and followed those procedures, even though the regs were not affected. Is that what happened? Well, I guess that is what happened. And I would call that not an independent and detached evaluation. But as I said, I think that this initial decision was void. I mean, the Supreme Court, you know, agreed that the removal provisions that pertain to this agency were not constitutional, but they didn't say, and therefore everything that the agency does is null and void. They said it's severable, right? What it said was, we will remand the case back to the Ninth Circuit to decide to the extent to which these particular CIDs can be ratified. So it did not address the issue as to whether or not it was void. But the director itself didn't need to be re-nominated, right? They just said the director stays, but the removal provision is severable and is out. Does that suggest that ratification is a fairly perfunctory process? That's not what this court said. This court in Newark Electric said that it can only be done, first of all, if the initial decision to issue the CID was not void and merely voidable. And secondly, if it was merely voidable, did they make an independent and detached evaluation? We would claim that they did and it would have been such an easy thing if the agency had wanted to just to issue a new CID. And in fact, they did so. This is the second of four CIDs. At the time that Ms. Moroney was closing down her business because of the huge expenses involved here, she had already produced huge You're about to close down. Well, before you do, we would like to have you respond to this third CID, which she did fully. And we have never been told that this third CID was not fully complied with. But they nonetheless somehow insist that we have not fully complied with the second CID. And what we're saying is, if they had wanted to ratify the mistake they made in issuing the second CID through an agency head who was not properly serving in an improperly structured agency, the easy thing to do would be to issue a new CID along the lines of the second CID. They didn't do that. So, Mr. Zamp, let me stop you there just because we've gone way over. You have two minutes of rebuttal. We'll now hear from Mr. Friedel. Friedel or Friedel? Friedel, Your Honor. Okay. Good morning. May it please the court. So the district court correctly ordered respondent to provide information about its debt collection business in response to the Bureau's CID. There's no cause to reverse that order. The respondent primarily focuses on three different constitutional arguments. But each one of those arguments is foreclosed by binding Supreme Court precedent. Respondent really has no response to this precedent in their brief, and indeed, hasn't even discussed them so far this morning. I'd start with the for-cause removal provision, which is controlled by the Supreme Court's recent decision in Collins v. Yellen, which came out after the Bureau filed its brief. We brought it to the court's attention in a 28-J letter before respondent's reply brief. And what that decision deals with is the effect of an invalid removal restriction. And what it held is that such a restriction does not render agency action void, and that a party is entitled to relief because of such a restriction only if it can show that the restriction caused it harm. Respondent can't make that showing here. The Bureau has—and indeed, they haven't even tried—the Bureau has continued to pursue enforcement of this CID well under the leadership of three different consecutive directors who were appointed by two different presidents and were movable at will by those presidents. There's no indication that the removal restriction had any effect on the Bureau's decisions with respect to the CID had either President Trump or President Biden had any issue with the CID. He could easily have made his preferences known and, if necessary, put in place a new director to carry out those wishes. That didn't happen. They can't meet their burden under controlling Supreme Court precedent to show any entitlement to relief. And that's really enough to resolve that. This issue, the court need not even consider the party's arguments with respect to ratification at this point. And I would also direct the court to Judge Bevis's decision along these lines, which we brought to the court's attention in another 28-J letter. Respondent's only answer, really, to this has been to say essentially that the Bureau didn't make arguments about how Collins applies prior to the Supreme Court issuing that decision. But our position has been consistent throughout that the removal restriction has had no effect on this CID, provides no reason that the CID should not have been enforced. Respondent also says that Collins was limited only to requests for retrospective relief, whereas they claim they're seeking prospective relief. Now, that's wrong for at least two reasons. Collins' remedial analysis was not limited only to claims for backwards-looking relief. The court simply explained that the challengers there, that their request for prospective relief had been rendered moot by subsequent events. But even if the court thought that that distinction appeared in Collins, which it doesn't, they themselves are only seeking retrospective relief in this case. They have complied with the CID. Now, they didn't comply in respect with every request in the CID. We're not seeking and we have not sought to compel any further productions in response to this CID. So even under their distinction that they're trying to draw, the only thing they could be entitled to here is backwards-looking relief. That would be this court ordering the Bureau to destroy or return the information it received in response to the CID. Unless there are questions, I would turn to the funding arguments, and those under the Appropriations Clause and the Non-Delegation Doctrine. We know from multiple decisions of the Supreme Court and this court that the Appropriations Clause is satisfied so long as federal spending has been authorized by statute. We have that here. Respondent does not dispute that the Bureau spending is authorized by statute. They try to draw a distinction between the Bureau and other entities that are funded through fees or assessments that they collect. But the Appropriations Clause is categorical. It requires all federal spending to be authorized by statute. There's not an exception there for spending that derives ultimately from fees. And if anything, this distinction that they're trying to draw cuts against them because many of these agencies funded through fees have no cap on the amount they can collect and spend. In Collins, for example, where the Supreme Court examined the Federal Housing Finance Agency, the court noted that the FHFA is funded through assessments that are, quote, unlimited so long as they don't exceed the agency's reasonable costs. Here, in contrast, the Bureau's, the amount of money that the Bureau can draw each year is capped based on a some certain, that's 12 percent of the Federal Reserve's operating expenses in 2009. So the amount increases only to, only because of annual inflation adjustments, but it's a some certain cap on the Bureau's funding that makes our funding more constrained than these other agencies that you mentioned, Judge Walker. Can I ask a question, Mr. Friedel? Yes. I mean, the Appropriations Clause talks about no money shall be drawn from the Treasury, but in consequence of appropriations made by law. Is there an argument? Has there been an argument any place where, like, in other words, that the Post Office, which is collecting fees, is not subject to the Appropriations Clause because that money is not in the Treasury, it's directly collected? I don't think you're arguing that, but I'm just curious. Is that a question? I'm not aware that any agency has made that argument, and we're not making that argument here. My understanding is that this money, under the Miscellaneous Receipts Act, there's a general background principle that money the Federal Government receives goes to Treasury. So I think it's functionally the same whether the money is drawn directly from the Treasury or is spent instead of going to the Treasury. In our case, the Federal Reserve transfers its net earnings to the Treasury each year. So, you know, if the Court thought that the Appropriations Clause wasn't even applicable, that, of course, would be another reason that we win. But we're not making that argument, and we're not suggesting that the Appropriations Clause does not apply to our use of funds. Okay. Thank you. So then I would turn to their non-delegation attack on the funding. And here, again, we cite on pages 23 and 24 of our brief multiple decisions of the Supreme Court approving delegations at least as broad as the one here. Respondents' answer is, well, those are distinguishable because they don't involve spending of money or don't directly involve spending money. But we know that that makes no difference here because of the Supreme Court's decision. So the Court found no non-delegation problem with an appropriation that was done outside of the annual appropriations process, applied ordinary non-delegation analysis, and emphasized the broad discretion that Congress has to appropriate money as it sees fit and to give the executive some role in determining the use to which those funds should be put. Skinner even more directly addresses this issue. It considered a statute that created a user fee regime by which an agency could collect fees and then spend that money. And the Supreme Court considered an argument that some sort of heightened non-delegation standard applies and squarely rejected that argument. So there's no support for the Respondent's argument on the non-delegation doctrine. It, again, is foreclosed by Supreme Court precedent. The last point I would make on the funding, just to respond to something in the Respondent's briefing, you know, they suggest over and over again that the Bureau's use of funds is unreviewable. Congress has no way of overseeing it. That's absolutely incorrect. Congress can and does oversee the Bureau's use of funds. If it wanted to hold a hearing on the Bureau's budget tomorrow, nothing would stop it from doing so. In addition, the Bureau's statute includes a number of specific mechanisms to ensure that Congress has visibility into and oversight over the Bureau's spending. We list those on pages five and six of our brief. The reports the Bureau has to submit to Congress, the audits, the multiple audits that are conducted. So there's really no basis for the claim that Congress has no way to review the Bureau's funding. It absolutely does, just as it does with any other agency. I guess I think the last point made in the briefs was about whether or not these opinions were just too broad, that they were duplicative, they were abusive. And there doesn't seem to be a lot in the record to indicate whether documents from the earlier CID had been produced or not produced, or whether you had some of these documents and they had to produce them again. Could you speak to that? Absolutely, Your Honor. So there was an earlier CID and Respondent did provide some information in response to that. Almost none of it. I think there was one document that was in the required format. Nothing else was. It was incomplete. The Respondent failed to certify the completeness of the production or that the accuracy of the production, and then subsequently clawed back the majority of that material based on claims of, not a privilege, but of confidentiality, which the District Court later considered and rejected. So what we were left with was essentially nothing that had been properly produced. Respondent has never identified any particular document that they say they were twice. And so they have not shown any clear error in the District Court's actual finding that the information sought was not already in the Bureau's possession, which would be their burden to show to prevail on this claim. Thank you very much. We'll now hear from Mr. Stamp for two minutes of rebuttal. Thank you, Your Honor. Turning first to the issue of Collins and the Supreme Court's decision involving the FHFA. The argument now is from Mr. Friedel is that there was no need for ratification at all as a result of the Collins decision. That was an argument that the government has been making for several years, including in Collins itself. However, it failed to make that argument in this case. It thereby has waived the right to make that argument and the court should not consider it. It only was raised in the course of 28 letters. And so, therefore, it is nothing that we've had an opportunity to brief. But secondly, I believe that Mr. Friedel has misrepresented the Collins decision. It was very clear that the plaintiffs in that particular case were not seeking any prospective relief. The only relief they were contracts entered into by the FHFA was so that they would get a refund of money that had been taken away from the corporations in which they were shareholders. So that the court said, yes, there are limitations on the right of a person who claims that the agency was improperly structured to get retrospective relief, but it said nothing about prospective relief. And the fact that it made that distinction between retrospective and prospective relief makes it very clear that Collins had nothing to say about that issue. If in fact, the Supreme Court was limiting the right to prospective relief, then it must have sub salientio reversed any number of its prior decisions. In particular, I'd like to focus on the free enterprise fund case in which the Supreme Court ruled that the PCAOB was improperly structured and it granted relief to the plaintiffs in that case. So that if their interpretation, if Mr. Friedel's interpretation of Collins is correct, the court has overruled the free enterprise fund case. The idea that this is a sum certain that was being appropriated each year to the CFPB simply is not correct when that sum is vastly in excess of what anybody is asking for in any given year. But Congress set the standard, right? So if Congress thinks that they should be spending more, they certainly could narrow it if they wanted. They could have hearings if they don't like what CFPB is doing. I don't understand what the problem is. Why is this not exactly what's contemplated by our prior case? Oh, there's no question that the 1910-11 Congress that adopted this particular statute, that was their intent. They wanted to keep the agency's budget from examined by future agencies. That's why section 5497 explicitly prohibits the appropriations committees from reviewing the funding of the agency. Yes, they can do audits, but what they can't do is to question the amount of funding, let alone decrease the funding. Now, of course, what you can say, well, if Congress doesn't like the law, it can change the law. Well, the problem is that it requires two-thirds of the Congress to do so. Obviously, the president and the CFPB like the idea that they have totally independent financing that is not subject to congressional control. But if Congress tries to change the law, the president is going to veto the bill, which means that it takes a two-thirds majority. So it's not simply a matter of at any time Congress can change what is going on. Well, the point is whether Congress has laid down a, quote, intelligible principle to which the person or body authorized is directed to conform. Because this is not simply a case where the agency is given a certain amount of leeway to spend appropriated funds for its particular purpose, but the details of it are left to the agency. This is a case where the agency has unlimited discretion to spend any amount of money it wants for any purpose it wants. If you're looking for historical precedent, there is none. There is no other agency that has ever existed like this. And that is exactly the sort of concern that caused the agency to previously hold that the CFPB was unconstitutionally structured, and the same thing for several other agencies. All right. Well, let's stop there. We've gone over every time, but it's an interesting issue or set of issues. Thank you very much.